Case number 24-3868 Dayton Area Chamber of Commerce et al. v. Robert F. Kennedy Jr. et al. Oral argument, 15 minutes per side. Mr. Buchholz for the appellants. Good morning, your honors. May it please the court, Jeffrey Buchholz for the Dayton Area Chamber, the Ohio Chamber, the Michigan Chamber, and the U.S. Chamber. I'd like to reserve three minutes for rebuttal, if I may. Three minutes? Three minutes, please. Thank you, your honors. The Dayton Area Chamber satisfied the established three-part test for associational standing in this case. The first part, the first prong, is identifying a member with injury in fact. It's undisputed that AbbVie and Pharmacyclics were members and had injury in fact. The second prong, germaneness, asks a different question. It's not about the member with injury in fact. That's what the first prong's about. The second prong, germaneness, asks a broader question about whether the lawsuit, the subject matter of the lawsuit, is germane to the purposes of the organization. The Dayton Area Chamber satisfied that prong because the purpose of this lawsuit is to challenge the constitutionality of government price controls. And there's nothing more natural, your honors, than a chamber of commerce challenging government price controls. The district court went astray because it asked the wrong question. It didn't ask whether the subject matter of this lawsuit, challenging price controls, is pertinent to the purposes of the Dayton Area Chamber. Instead, the district court self-consciously and explicitly asked a narrow, excuse me, adopted a narrow interpretation, that's the district court's words, of the interest at stake for purposes of germaneness and looked only at the injury in fact of AbbVie and Pharmacyclics. But that's prong one. Just sort of as a, the way we view this, is this, do you view it as a factual attack or a facial attack, this sort of motion to dismiss? Your honors, good question. I think this court's review is de novo because there really isn't any disputed fact. The district court didn't hold a hearing. There's no resolution of disputed facts. It's really just, and the government says this in their brief, we point this out in our reply, it's really just about the inferences to be drawn applying the legal standard for germaneness to the undisputed facts. But are we just looking at the complaint or considering the declarations that were filed and the press releases and all those things? Well, I think all of the above, all the information that was before the district court about what the purposes of the Dayton Area Chamber are and how that relates to the subject matter of this lawsuit. So, I mean, your honor alluded to the press release. The Dayton Area Chamber explained in a press release that the reason it brought this lawsuit was not just to advance the interests of the members with Article III standing, Pharmacyclics and AbbVie, whose drugs were selected in the first round of price controls, but more broadly because if this price control program is upheld, it sets a bad precedent. It's dangerous for all kinds of businesses, even businesses that have nothing to do with the pharma industry. And also, in between that more indirect concern, there are all sorts of businesses that are members of the Dayton Area Chamber. Again, the Dayton Area Chamber is a 2,200-member organization with businesses across the spectrum, small to large, all different industries. And there are a lot of industries that have ties to the pharma industry. And so even if the pharmaceutical companies like AbbVie and Pharmacyclics, whose drugs were selected in the first round of price controls, have the most obvious and direct injury in fact, and that's what's important for Prong 1, where you have to have a member with that kind of concrete injury that rises to the level of injury in fact, Prong 2 is about the interests of the organization and the purposes of the lawsuit. And there are all kinds of members of the Dayton Area Chamber as a broad-based chamber of commerce. When it comes to germane, what's sort of the limiting principle? I mean, it seems based on your argument, a regional chamber of commerce can't oppose any government regulation that impacts the national economy as long as they have a member that has standing. So is there any limiting principle? A few answers, Your Honor. The limiting principle, before I answer the limiting principle, the reason why associational standing exists, the Supreme Court made this point in United Food Workers against Brown and also in Auto Workers against Brock, is because of the First Amendment right to free association. So because citizens have a right to band together to advance their common interests, associational standing is appropriate. And so, yes, a chamber of commerce or any other sort of organization, I mean, a lot of the associational standing cases don't involve chambers of commerce. They involve the Sierra Club or the NACP or other kinds of organizations. Whatever the organization may be, people have a First Amendment right to band together in an organization to advance their common interests. And the Supreme Court in Brock, when the government took a run at asking the court openly to overrule associational standing, the court refused. The Supreme Court explained that because of that First Amendment backdrop, because of the importance of associational rights, associational standing is good for citizens and good for the legal system. The limiting principle, Your Honor, is the one set out in the Germania Standard itself, as the Supreme Court has explained it. Those two Supreme Court cases, Brock and Brown, the two that I just mentioned, make clear, I guess maybe the clearest expression of this is Justice Souter's opinion in Food Workers against Brown. The point of the Germania Standard is not to ensure that a member has injury in fact. Again, that's prong one, and prong two would just be duplicative if it was the same question. Instead, it's to assure adversarial vigor. That's what the Supreme Court said in Brown, to ensure that there's sufficient adversarial vigor. And when Your Honor looks at the cases that really are only a handful, where appellate courts have found the Germania prong not satisfied, there are cases where there was something really anomalous about what the association was doing. So take the Ninth Circuit case that the government cites, Pacific Northwest Power, where an association of power cooperatives, a cooperative of power generators, whose purpose was to advance their interest in selling electricity, invoked the Endangered Species Act and said, you know, these poor salmon, you can't approve this project because it will endanger the salmon. The court said, well, hold on a second. You're a business association whose interest is in the economic interest of your members in selling power. There's something very odd about your invoking the Endangered Species Act for the sake of the salmon. There are a few other cases to similar effect, where the interest that's at stake in the lawsuit was not just not core to the organization but was, if anything, at odds with what you would think of as the organization's interest. Town of Norwood in the First Circuit, to the same effect. There's another Ninth Circuit case called Ranchers and Cattlemen, where it's the same effect, where maybe because of the way the facts aligned in that particular lawsuit for competitive reasons or what have you, the organization of power cooperatives thought they'd be better off, their members would be better off, if this other project didn't get approved for maybe competition reasons. And so they invoked the Endangered Species Act. And the Ninth Circuit said, we don't trust you, the power cooperative organization, to invoke the Endangered Species Act. So, Your Honor, the limiting principle is that. It's that the Supreme Court has said germaneness is there to ensure adversarial vigor, and if there's a real mismatch, like a disconnect, something very anomalous about the subject matter of the lawsuit and how it relates or doesn't to the purpose of the organization, then that causes you to question whether the organization will pursue that claim with appropriate vigor. But don't I have somewhat of a mismatch here where the Dayton area chamber said, according to the complaint, it strives to improve the region's business climate. It seems like the region that it's referring to is Dayton. So isn't that sort of a mismatch? It's certainly not a mismatch in the sense of the Ninth Circuit case I was just describing, where the interest of the organization is, if anything, at odds with what you would think of as the purpose of the lawsuit. And there's nothing inconsistent about the Dayton area chamber being focused on the Dayton area. I'm certainly not going to dispute that the Dayton area chamber is focused on the Dayton area. But this is a federal statute. It applies in the whole country. And the government's mistake and the district court's mistake was focusing, again, only on the Article III injury in effect of the identified members withstanding and said those people, those members aren't based in the Dayton area, therefore the Dayton area chamber shouldn't care. But the Dayton area chamber should care because this statute applies nationwide. Other members of the Dayton area chamber will have drugs selected in additional future rounds of this statute, even if they weren't in the first round. Federal statutes apply nationwide. So, again, that brings me back to what's the limiting principle. It seems like as long as you have a member, you can challenge any federal statute as long as there's a member withstanding. Well, Your Honor, the limiting principle, again, is to ensure adversarial vigor. And so if there's the kind of anomaly that you have where a business organization is taking a position that you would normally think of as adverse to the interests of business, like invoking the Endangered Species Act to oppose approval of a business project, then that should cause the court to say, hold on a second, there's something wrong here. There's something that isn't right about this. Well, I think part of the standards, I think the Second Circuit has a case where it says part of the germane standard is does the association have any particular expertise or experience in the subject matter of the lawsuit? Now, what kind of expertise or experience does the Dayton Chamber have in challenging the drug price negotiation program? Well, Your Honor, the Dayton area chamber has been involved in challenging federal rules before, not just local rules. And I don't know exactly what the record contains about what the Dayton area chamber's experience or expertise is on government price controls in the pharma industry specifically. But I think the germane question, Your Honor, isn't that specific. It's mere pertinence between the litigation subject and the purposes of the organization. You know, the quote from the Dayton chamber says, quote, it strives to improve the region's business climate and overall standard of living through public policy advocacy. Well, one could argue that actually the improvement of the standard of living of the Dayton area citizenry could be improved with lower drug prices. But, Your Honor, it's for the Dayton area chamber to decide what its purposes are. And standing has to take the merits of the claims asserted as a given. This isn't an appeal about the merits. And so if the Dayton area chamber is right and the other chambers are right, that this price control program will be bad for the pharmaceutical companies who are most directly affected, but also bad for other companies and other industries that have ties to the pharmaceutical industry, and also for citizens and our grandchildren who won't have as many new drugs available because of the reduced incentives for innovation. We're not asking the court to agree with all of that in this appeal, but it's the prerogative of the Dayton area chamber and the citizens who've gathered together to pursue their common interests. What the district court was concerned about here is, though, that basically this was a forum shopping ploy. Because AbbVie and Pharmacyclics could certainly have sued on their own to challenge this drug price program. But, in fact, they chose to let the Dayton chamber do it because I guess they couldn't have gotten venue where the Dayton chamber tried to get venue. Now, what is your answer to the district court's conclusion that this was just a forum shopping ploy? So, Your Honor, forum shopping, as used by the district court and maybe in your question, sounds pejorative. But forum shopping within the limits of the venue statutes that Congress has created and the associational standing doctrine that the Supreme Court has enunciated is what lawyers are supposed to do to advance the interests of their clients. So, yes, it may be true that AbbVie could have brought a lawsuit on their own, but the same thing could be said about the members of associations in all the associational standing cases where the Supreme Court has nonetheless said, again, I'll point, Your Honor, to auto workers against Brock where Justice Marshall's opinion for the court not only rejects the government's request to overrule the doctrine but enthusiastically reaffirms it and says it's good for the legal system to have associations be able to bring these kinds of cases. But that gets back to Judge Mathis's question of what's the limiting principle. I mean, under your theory, it sounds like that any company like AbbVie or Pharmacyclics could simply join an association, which they did after the fact in this case, didn't they? Well, Your Honor, I don't think it's that. I don't think Pharmacyclics was even a member of the Dayton Chamber prior to the lawsuit, was it? So our view is that Pharmacyclics, because it's a wholly owned subsidiary of AbbVie, was a member by virtue of AbbVie's membership and didn't need to join separately in its own name. To resolve any question about that, Pharmacyclics subsequently joined in its own name. But I don't think that's really an important issue in terms of the germaneness question, which turns on, again, not the injury in fact of the name members or else it would be duplicative of prong one, but instead the relationship between the subject matter of the litigation, which is opposing government price controls in an important industry that affects not just those name members but lots of other members across the membership. That's paragraph 59 of the amended complaint, and it's in the declaration submitted by the Dayton Area Chamber. And there's nothing more natural than a Chamber of Commerce saying we don't like government price controls. What is your best case, do you think, closest on the facts that supports your position that, say, a local chamber like the Dayton Chamber can challenge on behalf of one of its members a national program like this? Your Honors, I see that I'm out of time, if I may answer Judge Gilman's question. Thank you. I don't have a case that involves a local Chamber of Commerce as a plaintiff. Most of the associational standing cases don't involve Chambers of Commerce. They involve voting rights organizations and environmental organizations and the like. But in all of those cases, you could say the same thing that Your Honor said a minute ago, that the member could assume their own. Well, not really. I mean, the ACLU, for example, there's a case where they were challenging voting rights. I mean, there's a natural connection there. Well, I guess, Your Honor, what I'm trying to say is there's a natural connection between a broad-based business organization that believes in free enterprise, that believes in opposing government overreach, challenging government price controls. There's nothing anomalous about that. There's nothing contrary to the interests of the Chamber. So it may be, Your Honor, that if there had been a local Dayton price control program, then you would think the first organization you would think of as the natural candidate to challenge that would be the Dayton Area Chamber. This is a national price control program, and there's nothing strange. There's nothing improper. There's nothing pejorative in the sense of the word forum shopping about a national price control program that affects businesses all around the country, not just the selected manufacturers, but businesses that depend on the pharma industry, that applies all around the country. If Congress wanted to pass a statute like it has in the Clean Air Act, for example, that says national challenges have to be brought in D.C., Congress could do that. But there's no such statute. I think you're out of time. Thank you. May it please the Court. Maxwell Baldy for the government. The germaneous inquiry is meant to ensure that an association suing on behalf of members itself has a concrete interest in the issues presented in the litigation, and that inquiry requires a connection between the organization's stated purpose and the claims the litigation advances. And plaintiffs seek to circumvent that requirement by asserting both their organizational interests and the litigation interests at the highest level of generality, but the germaneous inquiry requires more. I understand why my friend points to the salmon fishing case in the Ninth Circuit, because it seems patently ridiculous, and we agree that was correctly decided, but I would point you to cases like Children's Health Defense and Minnesota Federation of Teachers, where there's a much closer nexus between the level of the interests of the organizations and the litigation goals, but it still wasn't close enough. The Dayton Chamber's stated purpose So before you go there, let me just ask you, when you say that, I take you to be saying that the limiting principle that counsel has stated is actually too broad. That it's not the limiting principle. I don't think his limiting principle is the limiting principle. Okay. What he said was the limiting principle is adversarial presentation, and adversarial presentation is crucial. Without that, you can't have a case or controversy. But I don't think that's enough. I don't think it's enough to say, we're going to pursue this vigorously, and we believe in it to allow, you know, really, I think by their theory, they could challenge any economic regulation in the country as long as someone paid them membership dues, and that's not how associational standing should work. So if we look at this case, all three, the Dayton, Michigan, and Ohio Chambers, they all put declarations in, and the part where they describe their purpose is paragraph four of each of them, and they all describe themselves in distinctly local terms. The Dayton Chamber wants to improve the region's business climate. But this is a suit to challenge a program to allow the government to address skyrocketing prescription drug prices, and the claims they raise are claims that are tied to pharmaceutical companies, that the pharmaceutical companies will be deprived of property without due process, that the program will compel the companies to speak, that if they don't choose to withdraw from Medicare, they'll be subjected to excessive fines. Now, we dispute those claims, but those are the claims they're advancing. And when the operative complaint was filed, the program applied to 10 companies. Plaintiffs point to only one who could raise claims, Pharmacyclics. I think AbbVie might have a drug in the program now, but you can't pierce the corporate veil to establish standing, so we're really talking about Pharmacyclics. And they do nothing to explain how this company, and vindicating its interests, would be tied to the Dayton business climate. Instead, they point to, this is page 34 of their brief, when they talk about their broader interests, they say, quote, they have suppliers of raw materials, distributors, equipment makers, and builders of laboratories, and they also say they are interested in opposing the precedent set by the IRA. So let's break that in part. The idea that anyone in the supply chain, you know, would have an interest in challenging the regulation, I think, again, it's just a boundless, limitless principle, and it opens the floodgates to using associational standing to launder venue anywhere you want to sue. In terms of companies interested in opposing the precedent, I'm sure that they don't like this law, and they have a lot of members who think that it's bad policy, and they'd like to challenge it. But that's the step of an amicus brief. It's not the step of Article III standing. So when we talk about what a limiting principle is, I just don't see how their theory can be consistent with children's health defense, which acknowledges an unpublished case, but I think it's very much on point, where an organization that advocated against vaccinating children couldn't challenge a vaccine approval on behalf of their adult members who thought they themselves would be required to be vaccinated. This is an organization that has, you know, that was skeptical of vaccines in general, but they defined themselves, and they brought in members at the level of vaccinating children, and so that was sort of the limit of what they could challenge. And I point to Minnesota Federation of Teachers. This is the Eighth Circuit case where the teachers union was trying to challenge a state law that allowed funds to be diverted from public schools to private and religiously affiliated colleges. And if you think about what a teacher's union is and school funding, those things kind of go hand in hand. If you ask a teacher why they're joining the union, protecting their school budget is probably very high on the list. But what the Eighth Circuit said was, this is a taxpayer suit. You're saying that you're trying to represent in their capacity as taxpayers, and you're not a taxpayer organization. What those courts did was look at the specific claims brought and the specific purposes of the organizations, and we think that's the correct inquiry. And that allows a large number of associations to bring claims on behalf of their members when it's a natural fit, when it's why people have come together in an organization. But it doesn't allow you to sign up and say, we can sue on behalf of this organization, we can establish a venue wherever we want, and we can potentially extend relief to a whole bunch of other members who really don't have an Article III injury. And so I think plaintiffs' locally driven missions are much further removed from the claims here than in either of those cases. I'd point as an example to sort of the breadth of this. There's an amicus brief in this case filed by 149 local chambers of commerce. And under their theory, if they're right, pharmacyclics could have picked any single one of them and joined. And if the local chamber was amenable, they could have sued anywhere. Now, look, the federal government will defend lawsuits wherever that you lies. We're one of a few, probably the only litigant that's litigating in all 94 districts every single day. But we also think that you can't say we are a Silicon Valley-based pharmaceutical company, but we'd really rather be in the southern district of Ohio than the northern district of California. And here's an admittedly very clever way to try to get there. That's just not why we have associational standing. Again, their position is that all that's required is a connection to promoting a pro-business environment. That is a limitless standard. And they could use it to challenge anything from federal pollution regulations that affect South Carolina to fishery management plans in Alaska. You could tie any of those things to the free enterprise system, but that's just not why, I don't think that's why people join the Dayton Chamber. I don't think that's why this organization has come together. I gather that you don't have a case directly in point anymore than your opposing counsel does, do you? I think our two best cases are children's health defense and Minnesota Federation of Teachers. They're close but no cigar, and so this is somewhat a case of first impression, isn't it? I think that's fair, Your Honor. I don't think that there is a case that specifically addresses these facts. I mean, this is a relatively audacious effort to apply associational standing. I think, you know, I don't know that anyone has tried this other than they do, there is a case in, I think, the Northern District of Texas that disagreed with the district court. We think that was wrongly decided, but that's, you know, someone else has, another Chamber of Commerce has tried this. I think the Fort Worth Chamber of Commerce has tried this. But it is, you know, if there is a decision of this court that says, that blesses this practice, I think you're going to be seeing a whole lot of challenges from people who, from companies and businesses and organizations that want venue here. And they'll have no apparent ties to the organization or the region, but as long as there's sort of a very loose nexus, I think you'll be opening the floodgates to that litigation. Now don't some of the cases say sort of germane, this is an undemanding standard, and why isn't that standard, and you probably answered that, but why isn't that undemanding standard met here? Yeah, so I think it is true that it is, that cases say that. The original language comes from the D.C. Circuit's Humane Society v. Hodel case, which is kind of a touchstone of germaneness analysis, because germaneness wasn't really the focal point of any of the Supreme Court's cases on associational standing. And what the court said there was, the district court in Humane Society had held that it wasn't a core purpose of the organization, the litigation wasn't advancing a core purpose of the Humane Society as articulated in their bylaws, and so therefore it wasn't germane. And the D.C. Circuit rejected that. They said it's not that demanding. It serves the, quote, modest yet important goal of preventing litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care. I think that describes this case. But in many cases, germaneness is quite obvious, right? Hunt, the case that sets the standard, the organization that represents Washington apple growers clearly has an interest and is germane to their purpose to say that, you know, you can no longer sell Washington apples in North Carolina because of North Carolina labeling laws. That's an easy case. I think here the standard is undemanding, but it is still a standard. And if you are completely divorced from what has brought people together, if it's something about which you can't really show that this is why members have joined the organization, this is where we are expert, then you become what the D.C. Circuit called a law firm withstanding and the ability to, you know, bring suit in your own name without, you know, asserting an injury, that's associational standing. You represent members. But you can then sue wherever you want and you can potentially extend relief to all of your members. We think that's just an inappropriate use of the doctrine. So I'm happy to answer any further questions. Obviously three elements of associational standing. Do you sort of acknowledge or concede that the plaintiffs can satisfy the first and the third elements? So we acknowledge that pharmacyclics can satisfy the first element. We don't think that AbbVie can. And, you know, I'm happy to discuss why. I don't know that that is going to be dispositive here. But, you know, you can't pierce a corporate veil to establish standing. A shareholder cannot sue on behalf of a company unless you have, like, a derivative suit, which is obviously. You only need one to be satisfied. Correct, correct. So I can let AbbVie go. What about the third element? So on the third, so we recognize that in most cases when you're just seeking perspective, equitable relief, you don't need the participation of individual members. This case strikes us as different for this reason. When the operative complaint was filed, there were 10 companies who the law applied to. Seven of them brought suit in their own names. And I think by the time the judgments entered in this case, there were final judgments against four or five of them. So I think they're out. They're doing their own thing. They can't be represented. So that leaves us with three. One of them is pharmacyclics, which has this litigation. One of them has a suit that's being litigated by one of its sister companies. So I think it's Janssen Pharmaceutical sued us, and Janssen Biotech, which also had a drug, didn't file its own suit. And so there's one company that's left, and they are participating in another lawsuit in Texas. I think this is really a group of one at the time the operative complaint was filed, and that strikes us as a place where you kind of need individual participation because this might be the only member that could sue. So, you know, we recognize, again, that is also something that is usually easy to meet. But again, this sort of audacious effort to expand the doctrine, we think it's not met here. Further questions? All right. Thank you. The judgment should be affirmed. Thank you, Your Honors. A few points quickly. First, I ran out of time to answer your question, Judge Gilman, about my best case. I think Hodel, as my friend just was describing it, it is a leading case. It's probably the leading case in the courts of appeals on germanness. It was written shortly after the Supreme Court reaffirmed associational standing and shed more light on what germanness is for. Humane society case. Yes, yes, I'm sorry. Judge Wall's opinion for the D.C. Circuit, we're talking about the same case. And the way that my friend described that case, I think seized on some language in the case, but there's other language in the case that I think really on the whole shows that the case favors us. The issue there was really, does germanness set a high bar? Is it something more like centrality, core to the organization, or is it a lower bar pertinent to the organization? And the D.C. Circuit held, and that's now been followed by every court to have decided any germanness issue, that it's a lower bar, it's just pertinence. And there, the D.C. Circuit described the interest at stake in that lawsuit as a, quote, side goal, unquote, of the organization. So it certainly wasn't central to the organization, but it also wasn't at odds with the purpose of the organization, like in the Ninth Circuit power cooperative case I was describing or other cases to the same effect. And the D.C. Circuit said, that's good enough. Second, I want to respond about the children's health defense case from this court. Of course, that case is not precedential, but it's also, I think, a case that illuminates what the germanness standard is for. If here, if we had, if the Dayton area chamber, instead of being a broad-based chamber of commerce that included members from every industry, pharma, pharma adjacent, et cetera, instead, if it were just a specific industry association, I don't know, an auto industry association, only members in the auto industry, and it brought this suit, that would be like children's health defense. The court would say, wait a second, you have a very specific organizational purpose, and this case doesn't have anything to do with that. That would be like children's health defense, where a children's health organization was bringing a case about vaccination of military members. And the court said, hold on, that's strange. But this isn't like that. This is a broad-based chamber of commerce. There's nothing more natural, as I said before, for a broad-based chamber of commerce to oppose government price controls that injure its members, not just the ones directly affected by the price controls, but the ones indirectly affected, and the ones that will be affected as the IRA program expands in the coming years. Third, on the third prong of associational standing, my friend said, I believe the quote was most cases, if you're seeking only prospective relief, not damages, then the third prong is satisfied. That understates the case law. There is not one single case that the government's been able to find, or that I've been able to find, not one single case ever, where any court has said the third prong is not satisfied in a case seeking only prospective relief. This case is not about AbbVie and Pharmacyclics. That's necessary for prong one, but we're past prong one. This case is a facial constitutional challenge to the IRA. It's about the statute. The statute applies in the whole country, and the relief that's being sought is only prospective. You're talking about IRA. I assume that's the Inflation Reduction Act? Yes, Your Honor. Sorry for using that. I thought about retirement accounts. That would be a happier subject. I'm sorry, Your Honor. I meant the Inflation Reduction Act. But because that statute applies across the whole country, and we're only seeking prospective relief, this is as logical a venue as any. Again, if the government wants to defend cases that are national in scope in D.C., it can ask Congress to pass a statute like Congress has in certain areas, like the Clean Air Act that says national in scope cases have to go to D.C. Otherwise, you can call it forum shopping if you want, but what lawyers are supposed to do to defend their clients' interests is to sue in a venue that they think is legally available to them that, because of favorable case law or whatever, is advantageous. Right now you have California suing the government in New York. Excuse me, in Massachusetts, and you have New York suing in Rhode Island. Counsel, I'm going to have you finish your last point and wrap it up. We would ask the Court to reverse. Thank you very much. Thank you. All right, thank you for your briefing in this matter and for your very helpful argument. The cases will be submitted.